OPINION
{¶ 1} Defendant-appellant Barry C. Rogers appeals from his conviction and sentence for Engaging in a Pattern of Corrupt Activity and Conspiracy to Engage in a Pattern of Corrupt Activity. Rogers contends that the trial court erred in admitting evidence of illegal drugs obtained in controlled purchases from Jesse Mendez and Reginald Block. Rogers contends that it was improper to allow the State to authenticate State's Exhibits 1-2 and 4-9, the contraband obtained from the controlled purchases, with State's Exhibits 10-17, laboratory reports identifying the substance and amount of the contraband obtained from the controlled purchases. Rogers contends that the State failed to respond to Rogers' discovery requests, pursuant to Crim.R. 16(D), that the State provide notice of what evidence it intended to use at trial. As a result, Rogers contends that he never had an opportunity to object to the authentication, pursuant to R.C.2925.51(C).
 {¶ 2} Rogers does not assert that the State failed to properly serve the laboratory reports on him prior to his trial as required by R.C. 2925.51(B), and therefore, Rogers had notice that the laboratory reports would be used against him at his trial. Pursuant to R.C. 2925.51(C), once the laboratory reports were served on Rogers, Rogers had seven days from his receipt of the reports to demand the testimony of the person signing the report by serving the demand upon the prosecuting attorney. Rogers failed to make this demand We conclude that the trial court did not err in allowing the State to authenticate State's Exhibits 1-2 and 4-9 with the laboratory reports identifying the substance and amount of the contraband obtained from the controlled purchases.
 {¶ 3} Rogers contends that the trial court erred in admitting the evidence of illegal drugs obtained by the controlled purchases from Mendez and Block, because the crimes attributed to Mendez and Block are not relevant to the charges against Rogers. Rogers contends that even if the evidence is relevant, it is inadmissible as prejudicial. We conclude that the trial court did not err in admitting the evidence of illegal drugs obtained by the controlled purchases from Mendez and Block. We conclude that the evidence of the crimes attributed to Mendez and Block are relevant to the charges against Rogers to show the existence of an enterprise as well as the existence of a pattern of corrupt activity. We conclude that any prejudice suffered from admitting the evidence of the illegal drugs obtained from Mendez and Block in controlled purchases does not substantially outweigh its probative value on the pattern of corrupt activity issue.
 {¶ 4} Rogers contends that both of his convictions are against the manifest weight of the evidence, because the State failed to prove, beyond a reasonable doubt, that venue is proper in Miami County. Given that the State presented evidence that two incidents of corrupt activity or two overt acts took place in Miami County, we conclude that venue in Miami County was properly established for both counts, pursuant to R.C. 2901.12(H).
 {¶ 5} Rogers also contends that his conviction for Conspiracy to Engage in a Pattern of Corrupt Activity is against the manifest weight of the evidence, because the State failed to prove that Rogers and Mendez, an alleged co-conspirator, entered into an agreement or a plan to engage in a pattern of corrupt activity. Rogers argues that the testimony of Mendez is the only evidence of an agreement or plan between them, and that pursuant to R.C. 2923.01(H)(1), he cannot be convicted of conspiracy solely upon the testimony of a co-conspirator.
 {¶ 6} After reviewing the entire record, we conclude that there is other evidence, independent of the testimony of Mendez, which directly, or by reasonable inference, connects Rogers with the crime of Conspiracy to Engage in a Pattern of Corrupt Activity.
 {¶ 7} We conclude that Rogers' convictions are not against the manifest weight of the evidence.
 {¶ 8} Accordingly, the judgment of the trial court is affirmed.
 I {¶ 9} This case arises from a drug investigation conducted by Detective Dave Eshelman of the Miami County Sheriff's Department in 2001. Through a confidential informant, Mark Poling, Detective Eshelman made several controlled purchases of cocaine from Jesse Mendez and Reginald Block. Detective Eshelman had concluded that Mendez and Block were associated and had the same source of supply for cocaine. Special Agent Edward Derrenberger of the Ohio Attorney General's Office Bureau of Criminal Investigation was working with Detective Eshelman and Poling as an undercover agent in the investigation. Derrenberger also purchased cocaine from Mendez.
 {¶ 10} On January 3, 2002, Poling and Derrenberger contacted Mendez to purchase cocaine. Mendez did not have cocaine to sell at the time, but he contacted his source of supply for cocaine. Poling and Derrenberger went to pick Mendez up at his residence in Piqua to go meet Mendez's supplier for the cocaine. Poling, Derrenberger, and Mendez drove to the Needmore Road exit off Interstate 75, in Dayton, and parked at a McDonald's. Thereafter, a black Chevrolet Cavalier pulled up next to them, and Mendez indicated it was his supplier. Derrenberger observed a side profile of the driver of the Cavalier. Derrenberger gave Mendez $600 for the cocaine, and Mendez got out of Derrenberger's car and got into the Cavalier. Mendez left the parking lot in the Cavalier with his supplier to purchase the cocaine. The Cavalier returned to the parking lot, and Mendez exited the Cavalier and entered Derrenberger's car. Mendez then gave Derrenberger the cocaine. Although Detective Eshelman determined that the Cavalier was registered to Robert Grooms, Derrenberger and Poling identified the driver of the Cavalier, from a photograph, as Barry C. Rogers.
 {¶ 11} Mendez was subsequently arrested and charged. Mendez admitted to Detective Eshelman his involvement in the drug ring, he implicated Block, and he implicated Rogers as his source of supply for cocaine. Mendez admitted that from June 2001 to January 2002, he and Block sold cocaine that they purchased from Rogers at the Suburban Lodge in Dayton, where Rogers then resided. In exchange for the information, Detective Eshelman offered to make Mendez's cooperation known to the prosecution. Mendez pled guilty to four counts of Trafficking in Cocaine and one count of Engaging in a Pattern of Corrupt Activity.
 {¶ 12} Rogers and Block were indicted on one count of Engaging in a Pattern of Corrupt Activity, in violation of R.C.2923.32(A)(1), a felony of the first degree, and Conspiracy to Engage in a Pattern of Corrupt Activity, in violation of R.C.2923.01(A)(1) and R.C. 2923.32(A)(1), a felony of the second degree. Rogers was found guilty of both counts by a jury and was sentenced to four years incarceration for Engaging in a Pattern of Corrupt Activity and three years incarceration for Conspiracy to Engage in a Pattern of Corrupt Activity, to run concurrently. From his conviction and sentence, Rogers appeals.
 II {¶ 13} Rogers' first assignment of error is as follows:
 {¶ 14} "The trial court erred in admitting into evidence state's exhibits 1-2 and 4-9, the alleged illegal drugs obtained in the controlled buys from mendez and block."
 {¶ 15} Rogers first contends that the trial court erred in allowing the State to authenticate State's Exhibits 1-2 and 4-9, the contraband obtained in the controlled purchases from Mendez and Block, with State's Exhibits 10-17, laboratory reports identifying the substance and amount of the contraband obtained from the controlled purchases. Rogers contends that the State failed to respond to Rogers' discovery requests, pursuant to Crim.R. 16(D), that the State provide notice of what evidence it intended to use at trial. As a result, Rogers contends that he never had an opportunity to object to the authentication, pursuant to R.C. 2925.51(C).
 {¶ 16} Rogers does not assert in his brief that the State failed to properly serve the laboratory reports on him prior to his trial, as required by R.C. 2925.51(B). Rather, Rogers contends that "[t]he State of Ohio by declaring that defendant was provided with the lab reports, gloss[es] over its failure to respond to Rogers' Crim. Rule 12(D) motion." Rogers also acknowledges that he received a witness list that included the names of the lab technicians.
 {¶ 17} R.C. 2925.51(B) provides, in pertinent part, that "[t]he prosecuting attorney shall serve a copy of the report on the attorney of record for the accused, or on the accused if the accused has no attorney, prior to any proceeding in which thereport is to be used against the accused[.]" (Emphasis added.)
 {¶ 18} It is undisputed that the State properly served the laboratory reports on Rogers prior to his trial; consequently, Rogers had notice that the laboratory reports would be used against him at his trial. Once the laboratory reports were served on Rogers, Rogers had seven days from his receipt of the reports to demand "the testimony of the person signing the report, by serving the demand upon the prosecuting attorney[.]" R.C.2925.51(C). The record does not show that Rogers demanded the testimony of the person signing each report, or that he served the demand upon the prosecuting attorney. Rogers acknowledges that he did not make a demand when he argues that he was deprived of the right to do so. In order to exercise his right to do so, Rogers was required to make the demand within seven days of his receipt of the laboratory reports. Because Rogers failed to make this demand, the laboratory reports constituted "prima-facie evidence of the content, identity, and weight or the existence and number of unit dosages of the substance[s]." R.C. 2925.51(A), (C).
 {¶ 19} We conclude that the trial court did not err in allowing the State to authenticate State's Exhibits 1-2 and 4-9 with the laboratory reports that identified the substance and amount of the contraband obtained in the controlled purchases from Mendez and Block.
 {¶ 20} Rogers contends that the trial court erred in admitting the evidence of illegal drugs obtained in the controlled purchases from Mendez and Block, because the crimes attributed to Mendez and Block are not relevant to the charges against Rogers.
 {¶ 21} The indictment alleges that Rogers engaged in a pattern of corrupt activity in being associated with an enterprise and conducting or participating in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity. The indictment alleges that the enterprise consisted of a group of individuals, including Rogers and Block. The indictment alleges that sixteen incidents of corrupt activity took place from June 2001 to January 2002, establishing a pattern of corrupt activity. It alleges that four incidents of corrupt activity were committed by Rogers, nine incidents of corrupt activity were committed by Mendez, and three incidents of corrupt activity were committed by Block. At trial, the court admitted eight State's exhibits consisting of the illegal drugs obtained in the controlled purchases from Mendez and Block.
 {¶ 22} Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Evid.R. 402 provides, in pertinent part, that "[e]vidence which is not relevant is not admissible."
 {¶ 23} Rogers was convicted of Engaging in a Pattern of Corrupt Activity, in violation of R.C. 2923.32(A)(1), and Conspiracy to Engage in a Pattern of Corrupt Activity, in violation of R.C. 2923.01(A)(1) and R.C. 2923.32(A)(1). R.C.2923.32(A)(1), Engaging in a Pattern of Corrupt Activity, states "[n]o person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt." "Enterprise" is defined as "any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity." R.C.2923.31(C). "Pattern of corrupt activity" is defined as "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." R.C. 2923.31(E).
 {¶ 24} R.C. 2923.01(A)(1), Conspiracy, provides that "[n]o person, with purpose to commit or to promote or facilitate the commission of * * * engaging in a pattern of corrupt activity * * * shall * * * [w]ith another person or persons, plan or aid in planning the commission of any of the specified offenses[.]" R.C.2923.01(B) provides, in pertinent part, that "[n]o person shall be convicted of conspiracy unless a substantial overt act in furtherance of the conspiracy is alleged and proved to have been done by the accused or a person with whom the accused conspired, subsequent to the accused's entrance into the conspiracy."
 {¶ 25} Evidence of the crimes attributed to Mendez and Block is relevant to the charges against Rogers to show the existence of an enterprise, as well as a pattern of corrupt activity. The evidence makes it more probable that an enterprise existed involving Rogers, Mendez, and Block, because it establishes that a group of persons were associated in fact, although they did not comprise a legal entity. The evidence also makes it more probable that there was a pattern of corrupt activity involving Rogers, because it shows that there were two or more incidents of corrupt activity relating to the affairs of the same enterprise. Mendez testified that from June 2001 to January 2002, he and Block sold cocaine that they purchased from Rogers, indicating that the alleged incidents of corrupt activity against Mendez and Block involved Rogers. In addition, the evidence is relevant to establish a Conspiracy to Engage in a Pattern of Corrupt Activity, by showing that overt acts were committed in furtherance of the conspiracy by a person with whom the accused conspired, i.e., Mendez or Block. Rogers contends that even if the evidence is relevant, it is inadmissible as prejudicial.
 {¶ 26} Evid.R. 403(A) provides that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." "Resolution of the question of whether the probative value of evidence issubstantially outweighed by the danger of unfair prejudice, confusion of the issues, or of misleading the jury is necessarily commended to the discretion of the trial court." State v.Petty, Montgomery App. No. 13002, 1992 WL 120503, at *2. (Emphasis in original.)
We conclude that any prejudice suffered from admitting the evidence of the illegal drugs obtained from Mendez and Block in controlled purchases does not substantially outweigh its probative value on the pattern of corrupt activity issue. We cannot say that the trial court abused its discretion in determining that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury. We conclude that the trial court did not err in admitting evidence of illegal drugs obtained by the controlled purchases from Mendez and Block.
 {¶ 27} Rogers' first assignment of error is overruled.
 III {¶ 28} Rogers' second assignment of error is as follows:
 {¶ 29} "The conviction of rogers for engaging in corrupt activity and conspiracy to engage in a [pattern] of corrupt activity is against the manifest weight of the evidence."
 {¶ 30} Rogers contends that his conviction is against the manifest weight of the evidence, because the State failed to prove, beyond a reasonable doubt, that venue is proper in Miami County. Rogers contends that the State failed to establish that any action, attributable to Rogers, that it alleged to form a pattern of corrupt activity, occurred in Miami County. Rogers also contends that the State failed to establish that Rogers entered into a conspiracy to engage in a pattern of corrupt activity in Miami County. Rogers contends that the State's failure to establish venue constitutes plain error, and therefore, his conviction should be reversed.
 {¶ 31} When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, citation omitted. A conviction should be reversed and a new trial ordered "only in the exceptional case in which the evidence weighs heavily against the conviction." Id.
 {¶ 32} The State contends that the indictment alleges that both counts occurred in Miami County in a manner invoking jurisdiction. We reject this contention as immaterial. The issue is not whether venue was sufficiently alleged, but whether it was sufficiently proven.
 {¶ 33} "Although it is not a material element of the offense charged, venue is a fact [that] must be proved in criminal prosecutions unless it is waived by the defendant. The standard of proof is beyond a reasonable doubt, although venue need not be proved in express terms so long as it is established by all the facts and circumstances in the case." State v. Headley (1983),6 Ohio St.3d 475, 477, 6 OBR 526, 453 N.E.2d 716, internal citations omitted.
 {¶ 34} R.C. 2901.12(A) provides that "[t]he trial of a criminal case in this state shall be held in a court having jurisdiction of the subject matter, and in the territory of which the offense or any element of the offense was committed." R.C.2901.12(H) provides, in pertinent part, that "[w]hen an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried for all of those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses occurred. Without limitation on the evidence that may be used to establish the course of criminal conduct, any of the following is prima-facie evidence of a course of criminal conduct:
 {¶ 35} * *
 {¶ 36} "(2) The offenses were committed by the offender in the offender's same employment, or capacity, or relationship to another.
 {¶ 37} "(3) The offenses were committed as part of the same transaction or chain of events, or in furtherance of the same purpose or objective."
 {¶ 38} "In construing the foregoing statutory provisions Ohio courts have held that `a prosecution for engaging in a pattern of corrupt activity in violation of R.C. § 2923.32(A)(1) is properly venued in any county in which a portion of the corrupt activity occurred or in which an organization formed for the purpose of engaging in corrupt activity is based.'" State v. Zorn, Miami App. No. 98 CA 16, 1999 WL 64254, at *8, citations omitted.
 {¶ 39} The State contends that venue is proper in Miami County, because even though Mendez and Block bought the cocaine from Rogers in Montgomery County, they then transported that cocaine to Miami County and sold it. The State does not support its contention with any citation to the record.
 {¶ 40} In deciding whether venue in Miami County was appropriate, we must determine, with respect to each of the offenses of Engaging in a Pattern of Corrupt Activity and Conspiracy to Engage in a Pattern of Corrupt Activity, whether any element of that offense occurred within Miami County. SeeState v. Wellbaum, Champaign App. Nos. 2000-CA-5, 99 CR 073, 2000 WL 1232773, at *3.
 {¶ 41} Mendez testified that from June 2001 to January 2002, he and Block sold cocaine that they purchased from Rogers. Although Mendez testified that he purchased the cocaine from Rogers at the Suburban Lodge in Dayton, where Rogers resided during that period of time, Mendez also testified that he sold that cocaine in Piqua, where he lived. Dayton is located in Montgomery County, and Piqua is located in Miami County.
 {¶ 42} Mendez testified as follows:
 {¶ 43} "Q. Yeah. All right. He [Barry] was living at the Suburban Lodge at that time and I'm talking about from June of `01 to January of `02, right? Time frame I'm talking about. Where were you living?
 {¶ 44} "A. In Piqua.
 {¶ 45} * *
 {¶ 46} "Q. All right. Tell me what your association was then with the Defendant?
 {¶ 47} "A. We were like associates.
 {¶ 48} "Q. How so?
 {¶ 49} "A. (Inaudible)
 {¶ 50} "Q. All right. Well what'd you guys do together?
 {¶ 51} "A. (Inaudible) moved, moved to coke.
 {¶ 52} "Q. All right. Let's talk about cocaine. You just indicated to us that you and the Defendant were associates of some sort involving cocaine, is that fair?
 {¶ 53} "A. Yeah.
 {¶ 54} * *
 {¶ 55} "Q. Okay. Well, how did cocaine get, get involved in all this?
 {¶ 56} "A. He had a lot of coke, you know, he had coke, you know. And I sold it, you know, I could sell it.
 {¶ 57} "Q. All right. That's what I'm trying to find out. You sold cocaine?
 {¶ 58} "A. Yeah.
 {¶ 59} "Q. All right. Where did you get the cocaine?
 {¶ 60} "A. Through Barry.
 {¶ 61} "Q. All right. Now I want to talk about, um, let's talk about from June till about the beginning of August. Talk about in that first time frame. All right. So I don't confuse myself. Okay?
 {¶ 62} "A. Yeah.
 {¶ 63} "Q. All right. How much cocaine were you getting from him during that time period?
 {¶ 64} "A. About a half ounce a day every other day. * * *
 {¶ 65} "Q. All right. How much would that cost per half ounce?
 {¶ 66} "A. Four hundred dollars.
 {¶ 67} * *
 {¶ 68} "Q. Four hundred dollars. All right. Now is that what you would pay him for it?
 {¶ 69} "A. Yeah.
 {¶ 70} * *
 {¶ 71} "Q. * * * What would you do with it?
 {¶ 72} "A. Sell it.
 {¶ 73} * *
 {¶ 74} "Q. Okay. All right. So tell me how it was when you got the cocaine from Rogers. Did you go get it or did he bring it to you?
 {¶ 75} "A. First I just went and got it.
 {¶ 76} "Q. All right. So you went down to the Suburban Lodge, is that where you got it?
 {¶ 77} "A. Yes.
 {¶ 78} * *
 {¶ 79} "Q. * * * So when you wanted cocaine which would have been every day or every other day you would drive down there?
 {¶ 80} "A. Yeah.
 {¶ 81} * *
 {¶ 82} "Q. All right. And where would you sell this?
 {¶ 83} "A. Piqua.
 {¶ 84} "Q. I'm sorry?
 {¶ 85} "A. Piqua.
 {¶ 86} "Q. Piqua. All right. So you would bring the dope up here to sell it?
 {¶ 87} "A. Yeah.
 {¶ 88} "Q. Okay. And how many different people would you sell it to at any given time?
 {¶ 89} "A. I mean not a lot. Probably not a lot of people but I mean —
 {¶ 90} "Q. More than one, more than five?
 {¶ 91} "A. Yeah probably five, I mean on a regular basis probably about four or five.
 {¶ 92} * *
 {¶ 93} "Q. All right. So June to August every day, every other day a half ounce at a time?
 {¶ 94} "A. Yeah."
 {¶ 95} The indictment alleges sixteen incidents of corrupt activity establishing a pattern of corrupt activity. The second allegation in the indictment reads:
 {¶ 96} "2. On or about June of 2001 to September of 2001 JESSE J. MENDEZ did knowingly obtain, possess, or use cocaine a schedule II controlled substance in an amount greater than 5 grams but less than 25 grams in violation of Section2925.11(A)(1)(C)(4)(b) of the Revised Code a felony of the fourth degree."
 {¶ 97} Mendez testified that from June 2001 to August 2001, he sold cocaine, purchased from Rogers, in Piqua. Although Mendez testified that he bought the cocaine from Rogers in Dayton, in order to have sold that cocaine in Piqua, Mendez must have possessed that cocaine in Piqua. Mendez's testimony establishes that this incident of corrupt activity took place in Miami County.
 {¶ 98} The fifth allegation in the indictment provides as follows:
 {¶ 99} "On or about November 27, 2001 JESSE J. MENDEZ did knowingly sell or offer to sell cocaine a Schedule II controlled substance in an amount less than 5 grams. The offense being committed within the vicinity of a juvenile in violation of Section 2925.03(A)(1)(C)(4)(b) of the Revised Code a felony of the fourth degree."
 {¶ 100} Detective Eshelman of the Miami County Sheriff's Department testified that on November 27, 2001, his confidential informant, Poling, bought cocaine from Mendez for $200 at Mendez's residence in Piqua. Mendez also testified that the cocaine he sold Poling on November 27, 2001, at his residence in Piqua, was purchased from Rogers. The testimonies of Detective Eshelman and Mendez establish that this incident of corrupt activity took place in Miami County.
 {¶ 101} "Pattern of corrupt activity" is defined under R.C.2923.31(E) as "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." The testimonies of Mendez and Detective Eshelman establish that two incidents of corrupt activity, as alleged in the indictment, took place in Miami County. Even if Rogers was not directly involved in the Miami County activities of the drug ring, venue there was proper because his predicate acts were part of a criminal course of conduct, committed in his same relationship with Mendez and the enterprise, and in furtherance of the same purpose or objective — profiting from drug trafficking. See Zorn, supra. Although this issue is close, due to the minimal evidence in the record, we conclude that venue in Miami County was satisfactorily proven pursuant to R.C. 2901.12(H).
 {¶ 102} For the same reasons, we conclude that venue in Miami County was satisfactorily proven regarding the Conspiracy to Engage in a Pattern of Corrupt Activity count. Count Two in the indictment alleges that Block and Rogers did, plan or aid in the planning the commission of engaging in a pattern of corrupt activity and that the sixteen incidents of corrupt activity listed in Count One were the overt acts, required to establish Conspiracy to Engage in a Pattern of Corrupt Activity.
 {¶ 103} R.C. 2923.01(B) provides, in pertinent part, that "[n]o person shall be convicted of conspiracy unless a substantial overt act in furtherance of the conspiracy is alleged and proved to have been done by the accused or a person with whom the accused conspired, subsequent to the accused's entrance into the conspiracy."
 {¶ 104} The testimonies of Mendez and Detective Eshelman established that two overt acts took place in Miami County by Mendez, a person with whom Rogers conspired. Mendez testified that from June 2001 to August 2001, he sold cocaine, purchased from Rogers, in Piqua. Detective Eshelman of the Miami County Sheriff's Department testified that on November 27, 2001, his confidential informant, Poling, bought cocaine from Mendez for $200 at Mendez's residence in Piqua. Mendez also testified that the cocaine he sold Poling on November 27, 2001, at his residence in Piqua, was purchased from Rogers. Thus, venue in Miami County was properly established regarding the Conspiracy to Engage in a Pattern of Corrupt Activity count.
 {¶ 105} Rogers further argues that his conviction for Conspiracy to Engage in a Pattern of Corrupt Activity is against the manifest weight of the evidence, because the State failed to prove that Rogers and Mendez entered into an agreement or a plan to engage in a pattern of corrupt activity. Rogers argues that the testimony of Mendez is the only evidence of an agreement or plan between them, and that he cannot be convicted of conspiracy solely upon the testimony of a co-conspirator, pursuant to R.C.2923.01(H)(1).
 {¶ 106} R.C. 2923.01(H)(1) provides that "[n]o person shall be convicted of conspiracy upon the testimony of a person with whom the defendant conspired, unsupported by other evidence." There must be some evidence, independent of the testimony of the co-conspirator, that provides a connection between the defendant and the crime charged. State v. Tornstrom, Cuyahoga App. No. 72898, 1998 WL 811314, at *8, citation omitted. In determining whether a conviction has been sufficiently corroborated by other evidence, we must "eliminate from consideration the evidence of the accomplice witness and then examine the evidence of other witnesses with the view to ascertain if there be inculpatory evidence, that is evidence of incriminating character which tends to connect the defendant with the commission of the offense. If there is such evidence, the corroboration is sufficient; otherwise, it is not." Id., citation omitted. "[T]his `other evidence' need not be necessarily of sufficient strength to, by itself, constitute proof beyond a reasonable doubt, but must directly, or by reasonable inference, connect the defendant with the crime." Id.
 {¶ 107} R.C. 2923.01(A)(1) provides that "[n]o person, with purpose to commit or to promote or facilitate the commission of * * * engaging in a pattern of corrupt activity * * * shall * * * [w]ith another person or persons, plan or aid in planning the commission of any of the specified offenses[.]"
 {¶ 108} Mendez testified that his relationship with Rogers could be described as a partnership or association and that they "moved coke" together. However, there must be some evidence, independent of Mendez's testimony, connecting Rogers to a conspiracy.
 {¶ 109} The State contends that there is overwhelming evidence of a conspiracy between Rogers and Mendez. The State argues that "[i]n addition to Mendez' testimony, the State presented evidence from the Bureau of Criminal Investigation and Identification that involved an undercover agent who purchased Cocaine from Mendez and the Appellant, as well as admissible statements of the Appellant's statements to law enforcement." The State supports its contention with no citations to the record.
 {¶ 110} The record is devoid of any evidence that an undercover agent purchased cocaine directly from Rogers. There is evidence that Mendez purchased cocaine from Rogers, and that Derrenberger and Poling both purchased that cocaine from Mendez, which would indicate that Rogers planned with Mendez to engage in a pattern of corrupt activity.
 {¶ 111} Derrenberger testified that on January 3, 2002, he and Poling contacted Mendez to purchase cocaine. Derrenberger testified that Mendez told them that he did not have cocaine to sell at the time, but he was waiting to hear from his source of supply for cocaine. Derrenberger testified that later that day, Mendez informed them that his source also needed a fresh supply of cocaine and that they should meet Mendez to go to meet his source. Derrenberger testified that he and Poling picked Mendez up and then drove to the Needmore Road exit in Dayton and parked at a McDonald's. Derrenberger testified that a black Chevrolet Cavalier then pulled up next to them, and Mendez indicated it was his supplier. Derrenberger testified that he observed a side profile of the driver of the Cavalier. He testified that he gave Mendez $600 for the cocaine, and Mendez got out of Derrenberger's car and got into the Cavalier. Derrenberger testified that Mendez left the parking lot in the Cavalier with his supplier to purchase the cocaine. Derrenberger testified that when the Cavalier returned to the parking lot, Mendez exited the Cavalier, entered Derrenberger's car, and gave Derrenberger the cocaine. Detective Eshelman testified that Derrenberger and Poling later identified the driver of the Cavalier, from a photograph, as Rogers.
 {¶ 112} Detective Eshelman also testified that his confidential informant, Poling, made several controlled purchases of cocaine from Mendez and Block, and that Poling provided him with information that Block and Mendez had the same source of supply. Detective Eshelman testified that through cellular telephone records, he determined that Block and Mendez were obtaining cocaine from the Suburban Lodge, where Rogers was residing at the time. Detective Eshelman testified that because Poling was wired, Detective Eshelman heard Mendez refer to "Barry," as his source of supply, in conversing with Derrenberger. Detective Eshelman testified that after Mendez was arrested, he admitted to his involvement in the drug ring, implicated Block, and implicated Rogers as his source of supply for cocaine. Detective Eshelman also testified that he had already identified Rogers as Mendez's source prior to his interview with Mendez, and that Mendez only verified that Rogers was his source.
 {¶ 113} In addition, Detective Eshelman testified that Rogers admitted to selling to Mendez on three or four occasions. The State presented a tape of an interview between Detective Eshelman and Rogers, in which Rogers stated the following:
 {¶ 114} "BR: I just give him [Mendez] a ride to R's house, just give him a ride just because I knew the connection.
 {¶ 115} "DE: How many times a week do you think that Jesse came down to you?
 {¶ 116} "BR: Oh, maybe three or four times, total.
 {¶ 117} "DE: More than that.
 {¶ 118} "BR: No. Not from me. I mean, um —
 {¶ 119} "DE: I mean just in one week, normally two or three?
 {¶ 120} "BR: No. No. Definitely not. It wasn't coming from me and that is the truth. I know three or four times total from the time James got busted probably till Jesse got arrested. It was probably three or four times total he came down there.
 {¶ 121} * *
 {¶ 122} "DE: You don't remember how much he would come down and buy? Was it, was it uncommon for him to get a half ounce from you?
 {¶ 123} "BR: Yes.
 {¶ 124} "DE: It was unusual?
 {¶ 125} "BR: Yeah. It was probably a [sic] under. I'd say it was usually probably a quarter or an eighth of an ounce.
 {¶ 126} "DE: What was he paying for a quarter?
 {¶ 127} "BR: Goodness! I don't remember to be exact. Um, James took care of all that. It was probably two hundred and twenty-five, two hundred, something like that.
 {¶ 128} "DE: Okay. When you buy a half how much would [sic] have to pay?
 {¶ 129} "BR: Um, that's probably double that. Four hundred I would imagine.
 {¶ 130} "DE: When he would call you to get a larger amount than you had and you had to go R how would you set that up with R? Would you call him first or would you just go there knowing he would be there?
 {¶ 131} "BR: Well, I mean, before we go any further, I mean, I'm willing to help out but, I mean, how's this gonna help me, I mean —
 {¶ 132} "DE: Um, I'm the one that goes to the prosecutor and he's going to ask me what you had to say and I can tell him that you admitted to having a drug problem and it's not uncommon for drugs to have people do something that's out of character, that you were using and just middling to get free dope.
 {¶ 133} "BR: That's what I did."
 {¶ 134} Based on the testimony of Derrenberger and Detective Eshelman as well as the recorded conversation between Rogers and Detective Eshelman, we conclude that there is other evidence, independent of the testimony of Mendez, which directly, or by reasonable inference, connects Rogers with the crime of Conspiracy to Engage in a Pattern of Corrupt Activity. We conclude that Rogers' conviction for Conspiracy to Engage in a Pattern of Corrupt Activity is not against the manifest weight of the evidence.
 {¶ 135} Rogers' second assignment of error is overruled.
 IV {¶ 136} Both of Rogers' assignments of error having been overruled, the judgment of the trial court is affirmed.
Wolff and Young, JJ., concur.